**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **JOHN BROWN**,<br><br>*Plaintiff*<br><br>v.<br><br>**CITY OF PHILADELPHIA, et al.**,<br><br>*Defendants* | **Case No. 2:23-cv-04181-JDW** |

**MEMORANDUM**

Having heard the evidence and the Parties' arguments following a bench trial in this matter, I make the following findings of fact and conclusions of law, pursuant to Federal Rule of Civil Procedure 52(a)(1).

## I. FINDINGS OF FACT

1. Tamika Allen is a Lieutenant in the Philadelphia Police Department.

2. As of November 4, 2021, Lt. Allen was a sergeant in the Juvenile Enforcement Team or the JET Unit. As part of that unit, Lt. Allen receives and serves arrest warrants on juveniles and adults under age 21.

3. On November 4, 2021, the JET unit attempted to serve an arrest warrant on Elijah Brown.

4. Elijah lived in Baltimore, Maryland, but he would sometimes stay with his father, John Brown, at John's home at 434 South 55th Street in Philadelphia, Pennsylvania. John lives in a second-floor apartment at the back of a row home.[1]

5. On November 4, 2021—the date that officers attempted to serve the arrest warrant on Elijah—he was incarcerated in the George W. Hill Correctional Facility in Delaware County, Pennsylvania. He had been there since September 11, 2021.

6. The investigating officer who swore out the arrest warrant for Elijah put John's address on it.

7. There is no evidence in the record as to: (a) who applied for the warrant for Elijah; (b) why that person used John's address; or (c) whether that person inquired into whether Elijah was incarcerated at the time the warrant was to be served.

8. Lt. Allen was not the investigating officer who swore out the arrest warrant for Elijah. She did not do any investigation about where he lived or his whereabouts before attempting to serve the warrant, such as investigating whether he lived at John's residence. She also did not have access to the Jailtrak system to determine whether a potential arrestee is incarcerated, so she did not check whether Elijah was incarcerated at the time.

[1] I refer to John Brown as "John" and Elijah Brown as "Elijah" for clarity (because they would otherwise both be "Mr. Brown"), but I do not mean any disrespect by using familiar names.

9. When she went to serve Elijah with an arrest warrant, Lt. Allen did not know where he lived or whether he would be at John's apartment. There is also no evidence that Lt. Allen had personal knowledge that Elijah was incarcerated at the time.

10. When serving an arrest warrant, officers go to the address listed on the warrant. (*See* Tr. Day 1, 118:15.[2]) Lt. Allen and the other officers went to John's apartment.

11. On November 4, 2021, Lt. Allen was the commanding officer when law enforcement attempted to serve the arrest warrant on Elijah. This was a joint operation between the Philadelphia Police Department and the Philadelphia Sheriff's Office.

12. Sergeant Edwin Barreto from the Sheriff's Office was there as the Interviewer, which meant that he had the warrant in his possession and was there to talk to anyone who might be present in the home.

13. Though Sgt. Barreto and Lt. Allen were the same rank at the time, Sgt. Barreto deferred to Lt. Allen, as they were serving a Philadelphia Police Department warrant.

14. Like Lt. Allen, Sgt. Barreto did not conduct any investigation about Elijah's whereabouts. Sgt. Barreto is trained to do a custody check when applying for a warrant on behalf of the Sheriff's Office. However, he did not do a custody check in this instance because this was an arrest warrant from the Police Department.

---

[2] All citations to "Tr. Day 1" refer to the trial transcript from the first day of trial on May 26, 2026.

15. Around 6:50 a.m. on November 4, 2021, Lt. Allen and Sgt. Barreto arrived at John's apartment to execute the arrest warrant for Elijah. There was also a stack of about 10 officers who were there to assist them.

16. Upon arrival, the officers at the front of the stack knocked on John's door and announced their presence. Their knocking was so loud that it woke him up.

17. John suffered a stroke in 2018, and he has Type 2 diabetes. Having just awakened, John did not have an opportunity to take his diabetes medication and was feeling dizzy.

18. John saw lights shining through his windows and looked out to see police trying to enter his apartment. He put on some clothes and yelled that he was coming to the door.

19. When John got to the front door of his apartment, he opened it. He thought that the officers would knock down the door if he did not let them in.

20. Once John opened the door, the stack of officers entered his home. At the time, some of them were holding flashlights. They issued commands to John upon entering. There is no dispute that the initial group of officers' guns were unholstered as they entered the apartment.

21. Officers are trained to enter with their guns "at the ready" or in "a high compressed stance" or "Sul" position. This position requires them to hold their guns up high, close to their chests, with the barrel of the guns pointed downwards for safety. (*See*

Tr. Day 1, 93:22 – 94:5; 113:12-20.) However, John contends that the first officer who entered pointed his gun at John. (*See id.* at 80:25.)

22. Lt. Allen and Sgt. Barreto followed the stack of officers inside. When Lt. Allen entered John's home, she had her gun at the ready. However, once inside, Lt. Allen holstered her gun for safety because she could not get her footing in the home, due to debris and clutter on the floor. Lt. Allen did not point her gun at John at any point in time. Sgt. Barreto kept his gun holstered during this incident.

23. Upon entering the home, the stack of officers went to the bedroom in the back of John's apartment to search for Elijah. Lt. Allen and Sgt. Barreto did not search the apartment. They stayed closer to the front door with John.

24. Aside from the fact that the stack of officers searched the apartment for Elijah, there is no evidence about how they conducted their search. Upon realizing that Elijah was not there, Lt. Allen directed the officers to leave the apartment. The entire search lasted just a minute or so. (Tr. Day 1, 106:7-10; Tr. Day 2, 15:2-3.[3])

25. All the while, John was very upset and yelled at officers that Elijah was not in the apartment. He also asked to see a warrant multiple times. Sgt. Barreto was not permitted to leave a copy of the warrant with John, but he did offer to let John take a picture of it on his phone.

---

[3] All citations to "Tr. Day 2" refer to the trial transcript from the second day of trial on May 27, 2026.

26. John told the officers that his phone was in his bedroom, and he attempted to retrieve it while other officers were still looking for Elijah. However, John's phone was sitting on a table nearby, within arm's reach. Given the state of the apartment, and the fact that John's phone was not in the bedroom, Lt. Allen did not permit him to go to his room. She and Sgt. Barreto positioned themselves in such a way as to prevent John from going down the hallway to his room. Lt. Allen held her arm out to her side to stop him, but she did not touch him.

27. During this interaction with Lt. Allen and Sgt. Barreto, John was—by his own account—"all dizzy" and didn't "know what's going on." (Tr. Day 1, 18:5-6.)

28. Lt. Allen and Sgt. Barreto advised John that they were leaving his apartment. After they left, and before John could lock the door behind them, he blacked out. When John regained consciousness, he was on the floor and called 911 for medical assistance. EMS arrived and was able to enter the unlocked door to John's apartment. They found him on the floor and provided him with his medication. John declined a ride to the hospital, but he did go to the emergency room the following day. He claims he suffered injuries to his shoulder because of the fall.

29. I find Lt. Allen's and Sgt. Barreto's testimony about the entry, the search, and their brief interaction with John to be credible.

30. John tells a different version of the incident, in which a female officer in a white shirt grabbed his shorts and would not let him move. He contends that when he

went to get his phone, this female officer was standing behind him and grabbed the waistband of his shorts to prevent him from going to get his phone. However, I find his testimony not to be credible.

31. By John's own account, he was disoriented and didn't know what was going on during the brief period that officers were in his apartment. In fact, he never identified Lt. Allen as the woman who allegedly grabbed his waistband. (Tr. Day 1, 48:8.) Instead, he testified that the female officer who did this was wearing a white shirt. But Lt. Allen testified, credibly, that when she serves arrest warrants on adults, she wears her tactical uniform which is all black. John also testified that there was a white female officer on the scene that day, but Lt. Allen, again, provided credible testimony that there were no white female officers on the scene that day. John also described Sgt. Barreto as being a black officer, but he is not.

32. John's own testimony and his confusion about which officers were on the scene and where they were leads me to conclude that he could not accurately perceive the events unfolding around him. John also provided inconsistent testimony about the timing of events. Thus, I do not find his testimony to be credible.

## II. CONCLUSIONS OF LAW

### A. Section 1983 Claims

33. 42 U.S.C. § 1983 authorizes a person to seek redress for a violation of his federal rights by a person who was acting under color of state law. To recover under

Section 1983, a plaintiff must show two elements: (a) a person deprived him of a right that the Constitution or the laws of the United States secure; and (b) the deprivation was done under color of state law. *See West v.* Atkins, 487 U.S. 42, 48 (1988).

34. To prevail on a claim under Section 1983, a plaintiff must demonstrate that each defendant had "direct and personal involvement in the alleged [Constitutional] violation[s]." *Jutrowski v. Twp. of Riverdale*, 904 F.3d 280, 289 (3d Cir. 2018). A plaintiff cannot proceed against a defendant based on theories of vicarious or *respondeat superior* liability. *Id.* at 290. Personal involvement requires a showing that a defendant participated in or had "actual knowledge of and acquiescence in the wrongful conduct." *Chavarriaga v. New Jersey Dep't of Corr.*, 806 F.3d 210, 222 (3d Cir. 2015).

**i. Unlawful entry**

35. Lt. Allen entered John's home based on an arrest warrant, not a search warrant. "[W]hile an arrest warrant and a search warrant both serve to subject the probable-cause determination of the police to judicial review, the interests protected by the two warrants differ. An arrest warrant is issued … upon a showing that probable cause exists to believe that the subject of the warrant has committed an offense and thus the warrant primarily serves to protect an individual from an unreasonable seizure. A search warrant, in contrast is issued upon a showing of probable cause to believe that the legitimate object of a search is located in a particular place, and therefore safeguards an

individual's interest in the privacy of his home and possessions against the unjustified intrusion of the police." *Steagald v. U.S.*, 451 U.S. 204, 212-13 (1981).

36. As a rule, a police "officer may enter a home to execute an arrest warrant if [she] has probable cause to believe that (1) the arrestee lives there and (2) he is present then." *Miller v. City of Philadelphia*, 162 F.4th 88, 91 (3d Cir. 2025) (citation omitted). A probable cause determination requires a review of the totality of the circumstances. *U.S. v. Vasquez-Algarin*, 821 F.3d 467, 480 (3d Cir. 2016). In the context of second-hand information, that determination "encompasses considerations such as the basis and reliability of the information and the receiving officer's ability to corroborate its content[.]" *Id.* (quotation omitted). And the determination looks at the "collective knowledge" of the officers working together, rather than each officer individually. *U.S. v. Whitfield*, 634 F.3d 741, 745-46 (3d Cir. 2010).

37. John demonstrated that Lt. Allen did not have probable cause to believe that Elijah lived with John or that he would be present when she and the other officers attempted to execute the warrant.

38. *First*, there is no evidence that Lt. Allen had any reason to believe that Elijah lived at 434 South 55th Street. Lt. Allen did not have any personal knowledge about Elijah's address. Nor did anyone else on scene, so the collective knowledge doctrine will not help Lt. Allen. The only thing that Lt. Allen knew was that the arrest warrant for Elijah presumably listed an address for him. She did not know what information the

investigating officer had when he or she swore out the arrest warrant. And she did not do anything to verify the contents of the warrant. Instead, she only knew that the warrant listed an address. Standing alone, that's not enough.

39. The facts of this case are analogous to the facts that the Third Circuit held did not establish probable cause in *Vasquez-Algarin*. In that case, a Deputy Marshal relied on informant tips and the word of another detective but offered very little to corroborate that information to permit a district court to assess it. *See Vasquez-Algarin*, 821 F.3d at 480. That's similar to Lt. Allen, who relied on a warrant that a different officer swore out but who did not talk to the swearing officer or do anything else to corroborate the information in the warrant. And it stands in contrast to the facts in *Miller*, in which officers gathered residential information from a database that pulls information from taxes, credit reports, utility bills, and other similar information, and then did the same for the suspect's mother (because the suspect was a minor). *See Miller*, 162 F.4th at 92.

40. *Second*, even if Lt. Allen had probable cause to believe that Elijah lived with John—which she did not—her warrantless entry into the home would still be unlawful because she lacked probable cause to believe that he would be there when the officers attempted to execute the warrant. "An officer need not be certain or take every possible step to corroborate [her] information" about an arrestee's location. *Id.* at 92. But Lt. Allen did not take ***any*** steps to determine Elijah's whereabouts. She just went to the address on the warrant.

41. Her testimony on this issue was clear:

Q: Do you go and try to find out if that person will be there when you go to serve the warrant?

A: No.

(Tr. Day 1, 88:16-18.)

42. Nor does the early morning hour establish the necessary probable cause. In *Miller*, where officers arrived to serve an arrest warrant "just before 6 a.m.," the Third Circuit was careful not to rely on the time of day—on its own—to determine whether there was probable cause that a suspect would be home. *Miller*, 162 F.4th at 91. Instead, the Court found that there was sufficient probable cause due to "the ***very*** early hour, ***coupled with*** officers' knowledge of [the suspect's] age and probable cause as to his address[.]" *Id.* at 94 (emphasis added).

43. In contrast, Lt. Allen's arrival at John's home at 6:50 a.m. is not so early that it is sufficient—on its own—to establish probable cause that Elijah would be there. Elijah was an adult, unlike the teenager in *Miller*. And many people have left their homes by 6:50 a.m., unlike the arrival before 6 a.m. in *Miller*. Thus, probable cause would be lacking under the second prong of *Miller* as well.

44. Because there is no exception that applies to the warrantless entry into John's home, Lt. Allen's entry was unlawful.

**ii. Unlawful search**

45. During closing arguments, John's Counsel conceded that there was no evidence in the trial record that Lt. Allen searched John's apartment. (*See* Tr. Day 2, 19:9-22.) Instead, Lt. Allen waited with John while other officers searched for Elijah.

46. Because John has failed to prove that Lt. Allen had "direct and personal involvement" in the alleged unlawful search, he cannot hold her liable for this alleged constitutional violation. *Jutrowski*, 904 F.3d at 289.

**iii. Unlawful seizure**

47. It is not clear whether John is still pursuing a claim based on alleged unlawful seizure. He does not address this claim in his Proposed Findings Of Fact And Conclusions Of Law, and during oral argument, his Counsel advised that he was "mostly focused on the unlawful entry" claim. (Tr. Day 2, 21:10-11.) However, to the extent John is still pursuing this claim, he has failed to prove that Lt. Allen committed an unlawful seizure.

48. "A seizure can occur in two ways: 1) 'a laying on of hands or application of physical force to restrain movement, even when it is ultimately unsuccessful,' or 2) 'submission to a show of authority.'" *United States v. Amos*, 88 F.4th 446, 451 (3d Cir. 2023) (quotation omitted).

49. Lt. Allen did not put her hands on John or otherwise apply any physical force to his person. John never identified Lt. Allen as the female officer who grabbed him by the waistband, and I found his testimony not credible in any event.

50. As a result, John can only prevail on this claim if he can prove that he submitted to a show of authority. That requires determining "whether a reasonable person would have believed he was not free to leave based on the officer's words and actions." *Amos*, 88 F.4th at 452 (citation omitted).

51. There is evidence that Lt. Allen prevented John from going down a hallway to get to his bedroom to retrieve his phone. However, John did not present any evidence that she prevented him from leaving his home while the other officers conducted their search. Absent any evidence that a reasonable person would have believed he was not free to leave the scene, John cannot prevail on this unlawful seizure claim.

**iv. Excessive force**

52. "The question in excessive force cases is whether, under the totality of the circumstances, 'the officers' actions are objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation.'" *Anglemeyer v. Ammons*, 92 F.4th 184, 188 (3d Cir. 2024) (quotation omitted).

53. There are a variety of facts I can consider to determine whether an officer's actions are reasonable. But in this case, I need not undertake that analysis because I have already determined that John has not made the initial showing that Lt. Allen used any force against him. He therefore cannot prevail on an excessive force claim based on her allegedly grabbing his waistband.

54. Even if I found John's testimony credible on that issue—which I do not—I would conclude that such limited force was warranted to prevent John from going into his bedroom while the officers were searching his apartment.[4] Because John's phone was already in the room with him, he did not have a reason to go to his bedroom to retrieve it. Thus, Lt. Allen would have been justified in holding him back during those few moments.

55. John also failed to prove that Lt. Allen pointed a gun at him. He did not testify that she did. On the contrary, Lt. Allen testified that she holstered her gun once she got into his apartment. This testimony is unrebutted. Thus, John has failed to prove that Lt. Allen used excessive force against him by pointing a gun at him.

**B. State Law Claims**

56. John's state law claims for assault and battery fail for the same reason his excessive force claims fail.

57. In Pennsylvania, "[a]ssault is an intentional attempt by force to do an injury to the person of another, and a battery is committed whenever the violence menaced in an assault is actually done, though in ever so small a degree, upon the person." *Renk v. City of Pittsburgh*, 641 A.2d 289, 293 (Pa. 1994) (quotation omitted). But police officers "may use reasonable force to prevent interference with the exercise of [their] authority or

[4] Mr. Brown's Counsel conceded this point during closing arguments. (*See* Tr. Day 2, 18:15-21.)

the performance of [their] dut[ies]." *Id.* "The reasonableness of the force used … determines whether [a] police officer's conduct constitutes an assault and battery." *Id.*

58. Because John has not established that Lt. Allen used any force against him, his state law claims for assault and battery fail.

**C. Causation & Damages**

59. Having determined that Lt. Allen made an unlawful entry into John's home, the question is whether she is liable for any damages resulting from that constitutional violation.

60. Lt. Allen will be liable for any harm "proximately" or "legally" caused by her tortious conduct—*i.e.,* the illegal entry. *Bodine v. Warwick*, 72 F.3d 393, 400 (3d Cir. 1995).

61. John has not demonstrated that Lt. Allen's illegal entry into his home was the proximate cause of his injuries. While he contends that "the upsetting and shocking nature of the unlawful entry into his home caused him to black out, fall to the ground, and sustain injuries including a torn rotator cuff that required surgical repair[,]" he did not prove causation at trial. (ECF No. 44 at ¶ 5.)

62. John testified that on the morning in question, he woke up dizzy and felt that way as he looked out the window and saw police outside of his building. He admits that he felt dizzy before Lt. Allen (or any other officer) entered his apartment, as he did not have a chance to take his diabetes medication. This testimony dooms his causation argument.

63. Though he complained about being woken from his sleep at an early morning hour and the commotion arising from the officers' entry into his apartment, John failed to attribute his dizziness and subsequent fall to anything that Lt. Allen did. On the contrary, he assumed that the dizziness was from an increase in blood sugar:

> A: When they was out of the apartment, they said they was leaving but at that time I got real dizzy. Then my sugar probably went up high. And I passed out.

(Tr. Day 1, 21:12-14.)

> A: I don't know what happened, sir. My sugar went up high and I blacked out.

(*Id.* at 52:25 – 53:1.)

64. John did not offer any expert testimony that Lt. Allen's conduct caused his dizziness that morning. (*See* Tr. Day 2, 16:20-25.)

65. To the extent John contends that the stress of the morning's events exacerbated his existing dizziness and caused him to pass out, he has not tied any of the alleged stressful conduct to Lt. Allen personally. There is no evidence that Lt. Allen shined a light into his windows or his face, banged on his front door, pointed her gun at him, or took any other action that caused a "commotion." (Tr. Day 1, 20:15, 51:25.) Instead, the evidence reveals that she followed the stack of officers into John's apartment, holstered her gun upon entering, and then stood with John while waiting for the other officers to find Elijah.

66. Thus, even if John sustained injuries from passing out and falling, there is no evidence that Lt. Allen did anything to cause him to fall. John has failed to demonstrate proximate causation, so he cannot recover for any of the physical injuries about which he complains.

67. Nevertheless, "[w]here a constitutional deprivation has not caused actual injury, an award of nominal damages may be appropriate." *Pryer v. C.O. 3 Slavic*, 251 F.3d 448, 453 (3d Cir. 2001). Indeed, nominal damages "are the appropriate means of 'vindicating' rights whose deprivation has not caused actual, provable injury[.]" *Memphis Cmty. Sch. Dist. v. Stachura*, 477 U.S. 299, 308 n.11 (1986). In this case, Lt. Allen's unlawful entry into John's home strikes at the heart of the Fourth Amendment, and an award of nominal damages will signify "the importance to organized society that those rights be scrupulously observed[.]" *Id.* An appropriate Order will follow.

**BY THE COURT:**

*/s/ Joshua D. Wolson*
JOSHUA D. WOLSON, J.

November 5, 2026